UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Carrie E. Archambault,

    Plaintiff,

    v.   Civil Action No. 2:13-cv-292

Carolyn W. Colvin,
Acting Commissioner of Social Security
Administration,

    Defendant.

## OPINION AND ORDER
(Docs. 8, 15)

Plaintiff Carrie Archambault brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Archambault's motion to reverse the Commissioner's decision (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 15). For the reasons stated below, the Court GRANTS Archambault's motion, in part, DENIES the Commissioner's motion, and REMANDS for further proceedings and a new decision.

## Background

Archambault was 46 years old on her alleged disability onset date of September 23, 2009. She attended school through the eleventh grade, and has work

experience as a food preparer and cook at several businesses and facilities including at a general store, a hotel, a prison, a supermarket, and a nursing home.

Archambault has a history of childhood and adult abuse. She left home at the age of 18. She has married and divorced three times, and at least one of these marriages involved physical abuse. She has two adult children and one grandchild. On the date of the administrative hearing (July 2, 2012), she was living with and renting a room from a friend. (AR 46, 62.) At other times during the alleged disability period, she was living with a couple. (AR 282.) In August 2011, Archambault married for a fourth time. Her husband lives in Canada, and Archambault testified at the administrative hearing that she drives up to visit him "[e]very couple months." (AR 55.)

Archambault suffers from long-standing, severe right shoulder pain and more recently pain in her left shoulder as well. Between the years 2009 and 2012, she had three surgeries to address her right shoulder problems, the last surgery being a total shoulder replacement. She also has a rare lung disease known as pulmonary Langerhans histiocytosis, asthma, daily headaches, and sleep problems. Despite persistent recommendations from her doctors to stop smoking cigarettes, Archambault continued to smoke during the alleged disability period, exacerbating her breathing issues. In addition to her physical ailments, Archambault also suffers from anxiety, panic attacks, and depression. On a typical day, Archambault watches television, showers, makes her bed, prepares simple meals for herself, sits outside, relaxes, and takes a nap. (AR 57.) She also goes grocery shopping, socializes with friends, and tries to help her housemate with household chores. (AR 55, 61.)

In May 2010, Archambault filed applications for supplemental security income and disability insurance benefits. In her disability application, she alleged that she has been unable to work since March 11, 2009[1] due to shoulder replacement surgery, progressive arthritis, and lung disease. (AR 247.) She subsequently updated her application to add that she experienced a shooting pain down her arm; her left arm was "getting bad"; she was having more difficulty breathing; and she was always nervous and her mind felt like it was in a cloud. (AR 274.) She further stated that she was seeing a mental health worker for anxiety and depression. (*Id.*)

On July 2, 2012, Administrative Law Judge ("ALJ") Paul Martin conducted a hearing on the disability application. (AR 41–72.) Archambault appeared and testified, and was represented by counsel. On July 18, 2012, the ALJ issued a decision finding that Archambault was not disabled under the Social Security Act from her alleged onset date through the date of the decision. (AR 12–25.) Thereafter, the Appeals Council denied Archambault's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–3.) Having exhausted her administrative remedies, Archambault filed the Complaint in this action on November 6, 2013. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial

---

[1] In June 2012, just before the administrative hearing, Archambault amended her alleged disability onset date from March 11, 2009 to September 23, 2009. (AR 215.)

3

gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Martin first determined that Archambault had not engaged in substantial gainful activity since her alleged disability onset date of September 23, 2009. (AR 14.) At step two, the ALJ found that Archambault had the following severe impairments: "right shoulder osteoarthritis status post multiple surgeries, asthma, Langerhans histiocytosis, an anxiety disorder, and an affective disorder." (*Id.*) At step three, the ALJ determined that none of Archambault's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14–16.) Next, the ALJ determined that Archambault had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:

> [S]he is limited to lifting and carrying up to five pounds maximum with the right upper extremity. She can perform overhead work on less than an occasional [basis], or [for] short, brief, occasional times per day, but generally speaking no overhead work. In general, she can perform no reaching forward. Objects will need to be kept close to the body. She has no difficulty otherwise with manipulation. [Archambault] can perform pushing and pulling occasionally. She can never climb ladders, ropes, or scaffolds. [She] is limited to groups of less than ten; she cannot work in large crowds. She has the ability to interact with supervisors and coworkers and the general public. She can adapt to routine work environments and make simple decisions. She can understand, remember, and carry out moderately complex tasks. [Archambault] also should have no concentrated exposure to temperature extremes, particularly heat, as well as fumes, dusts, and gases.

(AR 16.)

Given this RFC, the ALJ found that, although Archambault was unable to perform her past relevant work as a cook, there were other jobs existing in significant numbers in the national economy that she could perform, including office helper, storage facility clerk, charge account clerk, surveillance system monitor, and eyeglass assembler. (AR

5

23–24.)  The ALJ concluded that Archambault had not been under a disability from the alleged onset date of September 23, 2009 through the date of the decision.  (AR 24–25.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Archambault argues that the ALJ should have given more weight to the opinions of two treating physicians: Dr. John Macy, an orthopaedic surgeon who opined that Archambault would miss more than four days of work each month due to her shoulder impairment (AR 792), and Dr. Richard Edelstein, a psychiatrist who opined that Archambault would miss three days of work each month due to her anxiety disorder and panic attacks (AR 802). The Commissioner responds by asserting that the ALJ properly analyzed the opinions of Dr. Macy and Dr. Edelstein, and the ALJ's RFC determination is supported by substantial evidence. For the reasons explained below, the Court finds that the ALJ did not give good reasons for affording little or no weight to the opinions of treating physicians Macy and Edelstein, in violation of the treating physician rule. Therefore, the Court remands the matter for further proceedings and a new decision.

A treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). When an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so. *Schaal v.*

7

*Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).  The Second Circuit has consistently held that the failure to provide "good reasons" for not crediting the opinions of a claimant's treating physician is a ground for remand.  *Sanders v. Comm'r Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (citing *Schaal*, 134. F.3d at 505; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.")).

**I.    Dr. Macy**

In a January 2012 treatment note, Dr. Macy assessed Archambault as having severe, chronic right osteoarthrosis involving the shoulder region which was unresponsive to treatment.  (AR 634.)  Approximately one month later, Dr. Macy recorded that Archambault's right shoulder discomfort was "moderate to severe in intensity and is constant and has been progressively worsening."  (AR 776.)  Dr. Macy performed total shoulder replacement surgery on Archambault's right shoulder in April 2012.  (AR 770–73.)  In June 2012, Dr. Macy opined that, due to limited strength and range of motion in her right shoulder, Archambault was significantly limited in her ability to lift, carry, reach, push, pull, and do postural activities.  (AR 763, 793–94.)  Dr. Macy further opined that Archambault would miss more than four days of work each month as a result of limited strength, reduced endurance, weakness, and pain in her right shoulder.  (AR 792, 796.)

The ALJ gave "moderate weight" to Dr. Macy's opinions that Archambault "could perform work consistent with the sedentary exertional level, but that she would have limitations [i]n using her right upper extremity for lifting, carrying, reaching, pushing, and pulling." (AR 20.) In contrast, the ALJ gave "little weight" to Dr. Macy's opinion that Archambault would miss more than four days of work each month due to her shoulder impairment. (*Id.*) The ALJ explained: "It is unclear upon what Dr. Macy bases [this] opinion," and "[t]he record does not document an unusual number of missed appointments or chronic lateness"; "[Dr. Macy] does not suggest that [Archambault] would be unable to concentrate at work." (*Id.*) These are not "good reasons" for affording little weight to Dr. Macy's opinion that Archambault would miss more than four days of work each month. This opinion was clearly based solely on Archambault's right shoulder impairment, not on any mental impairment which might cause Archambault to miss or be chronically late for appointments, or have limited ability to concentrate. Generally, a shoulder impairment would not cause a patient to miss or be late for medical appointments, as a mental impairment might. Moreover, as an orthopaedist, Dr. Macy specialized in treating shoulder injuries, and unambiguously stated in his paperwork that his opinions regarding Archambault's limitations were based on the fact that her right shoulder joint had been replaced, resulting in weakness, pain, decreased endurance, and limited range of motion. (AR 791–96.)

The ALJ also found that, "[o]verall," Dr. Macy's opinions were entitled to "little weight" because they were "not consistent with the medical evidence of record . . . or [Archambault's] own reports of her condition." (AR 21.) These are also not "good

9

reasons" for affording little weight to Dr. Macy's opinion that Archambault would miss more than four days of work each month, because they are not supported by substantial evidence. Earlier in his decision, the ALJ discussed Archambault's own reports of her condition, stating as follows:

> In her function reports, [Archambault] described drinking coffee, showering, visit[ing] with friends, preparing meals, and watching television on a daily basis. She endorsed difficulty getting a shirt on, pulling up pants, cutting meat, and bending to reach for things. She prepares meals including sandwiches, salads, pasta, and frozen foods. She is able to do the laundry, though she endorses some pain with folding clothes, which would involve prolonged reaching. [She] endorsed difficulty with reaching, pushing, and pulling. She is able to go grocery shopping, lifting the items off of the shelf and putting them in the cart, though she has someone else unload the car and put the groceries away. She endorsed being able to lift up to 5 pounds.

(AR 19 (citations omitted).) This description of Archambault's daily activities and abilities, which is substantiated in the record, does not indicate that Archambault was able to do more than Dr. Macy opined she could do. Rather, this description—and the record as a whole—supports Dr. Macy's opinions, depicting how limited Archambault's daily activities and abilities were during the alleged disability period. Doing activities like drinking coffee, showering, visiting with friends, and watching television do not demonstrate an ability to perform significant work activity for sustained periods. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("a claimant need not be an invalid to be found disabled under the Social Security Act") (internal quotation marks omitted).

Moreover, the record reveals that Archambault's ability to prepare meals and do almost any activity involving use of her upper extremities was quite limited. Archambault stated as follows in a May 2010 Function Report: she had difficulty

10

preparing dinner and needed someone to cut her meat for her; she was limited in her ability to move her arm into her shirt and pull up her pants; she cut her hair short because her ability to care for it was limited; and her arm "bother[ed] her a lot more after cooking." (AR 264–66.) Regarding housework, Archambault stated that she cleaned only "a bit" and did "some laundry" but had difficulty folding clothes. (*Id.*) Although she could drive, she stated that she had to use her left arm to put her car in gear and drove with only one hand. (AR 267.) She further stated that, although she could go grocery shopping on a weekly basis, she was unable to unload the groceries from the car and put them away. (*Id.*) A more recent Function Report (November 2010) indicates that Archambault's ability to do these activities decreased during the alleged disability period, and she needed help with the laundry, vacuuming, and making beds. (AR 282–86.) She stated that she was "very limited" in her ability to use her right hand due to shoulder pain and discomfort. (AR 287.) Similarly, at the July 2012 administrative hearing, Archambault testified that, due to her right shoulder impairment, she is not able to lift heavy objects; she is unable to lift even light objects over shoulder height; and she has significant pain upon reaching. (AR 51–52.)

   Thus, substantial evidence does not support the ALJ's finding that Dr. Macy's opinions are inconsistent with Archambault's own reports of her condition. Nor does substantial evidence support the ALJ's finding that Dr. Macy's opinions are inconsistent with the medical evidence of record. Starting in 2008 (prior to the alleged disability onset date), Archambault complained of significant and debilitating right shoulder pain to her medical providers. An October 2008 treatment note prepared by her primary care

11

provider, Dr. John Lippmann, states that she presented with a complaint of gradual, severe right shoulder pain that had been occurring in a persistent pattern for weeks and was worsening. (AR 455.) The note states that the pain "is characterized as a sharp stabbing," "is aggravated by any movement," and "[t]here are no relieving factors." (*Id.*) A March 2009 treatment note from Dr. Irvin Sabrsula indicates that Archambault had had five months of severe right shoulder pain, which was increasing despite physical therapy and which was exacerbated upon movement. (AR 468.) After her first shoulder surgery in June 2009, physical therapy notes from August 2009 indicate that her pain had not decreased. (AR 401–04.) After her second shoulder surgery in February 2010, physical therapy notes from May 2010 indicate that, despite her "[g]ood attendance," Archambault was still having persistent pain, as well as decreased mobility, decreased strength, and dysfunction. (AR 428.) Likewise, an August 2010 treatment note from Dr. Bryan Huber, an orthopaedist, records that Archambault was having "persistent [right shoulder] pain," despite injections and increasing dosages of narcotics. (AR 560.) Dr. Huber stated that, depending on the results of an EMG on the shoulder, he would "consider diagnosis of arthroscopy and/or consult with Dr. Macy." (*Id.*) In an October 2011 letter to Dr. Macy, Dr. S. Glen Neale stated that Archambault "seem[ed] . . . to have a catch in her shoulder," and had "pain with 90 degrees of abduction [and] pain with external rotation with tightness." (AR 610.) Dr. Neale stated: "It is my sense that the only thing that would help [Archambault] at this point would be consideration for total shoulder [replacement]." (*Id.*)

12

Treatment notes from her initial visit with Dr. Macy in January 2012 document that Archambault was having "constant[,]" "moderate to severe" discomfort in her right shoulder, aggravated by lifting the arm above the head, elevating the arm, strenuous activity, activities of daily living, and working around the house. (AR 632.) Her pain was described as "aching and dull" and radiating into her upper arm, and was noted to interfere with sleep and to be present at rest. (*Id.*) There was also "decreased right shoulder motion, catching in the right shoulder, and weakness." (*Id.*) Dr. Macy stated that Archambault had found no relief from prior treatments, including treatment with a physical therapist, Dr. Lippmann, Dr. Huber, Dr. Neale, and at least one other physician; and that the "[p]ersistent and progressive discomfort [was] interfering with [her] activities of daily living, recreational activities, and . . . ability to work." (*Id.*) As stated above, Dr. Macy assessed Archambault as having severe, chronic right osteoarthrosis involving the shoulder region which was unresponsive to treatment. (AR 634.) Approximately four months later, in April 2012, Dr. Macy performed the third shoulder surgery on Archambault, and approximately two months after that, in June 2012, Dr. Macy prepared the opinions at issue here regarding Archambault's limitations caused by her shoulder impairment.

These medical records are consistent with Dr. Macy's opinions, and thus substantial evidence does not support the ALJ's finding that Dr. Macy's opinions are "not consistent with the medical evidence of record." (AR 21.) The Commissioner argues that the ALJ properly considered Dr. Lippmann's treatment notes which "consistently stated that [Archambault] felt well with none or minor complaints only." (Doc. 15-1 at

13

10; *see* AR 19 (citing AR 478, 485, 490, 504, 571, 627, 638, 643, 661).) But Dr. Lippmann is Archambault's primary care provider, whereas Dr. Macy is her specialist. On the subject of her right shoulder impairment, Dr. Macy's treatment notes are more valuable. Moreover, as Archambault argues in her Reply (*see, e.g.*, Doc. 16 at 1-2), Dr. Lippmann's notation that Archambault was "feel[ing] well with [only] minor complaints" (AR 490) appears to have been boilerplate language used in Dr. Lippmann's treatment notes sometimes irrespective of how Archambault was feeling on the day of treatment. For example, although that language is contained in a March 2010 treatment note from Dr. Lippmann, the same note also states that Archambault was feeling "short of breath with some wheezing" and was requesting a different medication to help relax her shoulder muscles because her shoulder was "not going as well as she had hoped" after her second surgery.[2] (*Id.*) Furthermore, despite these notations that Archambault was feeling well with only minor complaints, in a June 2011 Medical Report for General Assistance, Dr. Lippmann stated that Archambault's prognosis was "poor" and she was unable to work at her usual occupation. (AR 626.)

The Court therefore finds that the ALJ did not give "good reasons" for affording little weight to Dr. Macy's opinion that Archambault would miss more than four days of work each month. Archambault asserts that the ALJ should have recontacted Dr. Macy because, in discussing Dr. Macy's opinions in his decision, the ALJ used the word

---

[2] Also noteworthy, Archambault's second shoulder surgery occurred only approximately one month before Dr. Lippmann prepared this March 2010 treatment note. Thus, it was likely she was feeling at least minimal discomfort or limited range of motion in her shoulder when Dr. Lippmann wrote that she was feeling well with only minor complaints. On the last page of the March 2010 note, Dr. Lippmann wrote: "[Archambault] needs to follow up with ortho[paedist] regarding course of progression and plan for muscle relaxation etc." (AR 493.)

14

"unclear" several times. (Doc. 8-1 at 25.) The Court disagrees that this alone triggers the ALJ's duty to recontact Dr. Macy, and leaves it to the ALJ to determine on remand whether to recontact him. *See Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.") (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)); SSR 96-5p, 1996 WL 374183, at *6 (1996) ("[I]f the evidence does not support a treating source's opinion . . . and the [ALJ] cannot ascertain the basis of the opinion from the case record, the [ALJ] must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

## II.     Dr. Edelstein

The ALJ also did not give good reasons for affording little or no weight to the opinions of Dr. Edelstein, Archambault's treating psychiatrist. In December 2010, Dr. Edelstein performed a Psychiatric Evaluation of Archambault. (AR 600–02.) He assessed Archambault as "a 47-year-old woman with a history of childhood and adult abuse with a long history of chronic depression, presenting now with exacerbation of depressive symptoms and . . . panic attacks since [a] relationship breakup [three] months ago. Symptoms persist despite current medication treatment." (AR 601–02.) Dr. Edelstein diagnosed Archambault with panic disorder and posttraumatic stress disorder ("PTSD"), among other ailments. (AR 601.) After treating Archambault for approximately 18 months, in June 2012, Dr. Edelstein opined that Archambault's mental impairments—including panic disorder, PTSD, anxiety, and pain attacks—resulted in

15

"[m]arked" deficiencies in concentration, persistence, or pace (AR 798, 800); caused episodes of decompensation (panic attacks) every one to two months (AR 798); met the criteria for categories A and B of Listing 12.06 (AR 799); and caused Archambault to miss three days of work per month (*id.*; AR 802). Dr. Edelstein further opined that Archambault's mental impairments resulted in "[m]oderate" limitations in responding appropriately to changes in the work setting; understanding, remembering, and carrying out complex job instructions; and demonstrating reliability. (AR 800–02.)

The ALJ's decision appears to indicate that "some weight" is afforded to Dr. Edelstein's opinion that Archambault would miss three days of work each month due to her mental impairments. (AR 22–23.) And the decision appears to afford no weight to Dr. Edelstein's opinion that Archambault had marked limitations in sustaining attention and concentration. (AR 23.) Given that the ALJ's RFC determination includes few limitations due to mental impairments,[3] it can be inferred that the ALJ afforded little or no weight to each of these opinions, despite the ALJ's statement that he afforded "some weight" to Dr. Edelstein's opinions. (*Id.*) The only rationale provided by the ALJ in support of his allocation of reduced weight to these opinions of Dr. Edelstein is as follows: "Treatment notes do not describe [Archambault] as unable to sustain attention during office visits. Her mental status examinations have been largely within normal limits [and] [Archambault's] function reports do not allege difficulty paying attention." (*Id.*)

---

[3] As noted above, the ALJ's RFC determination includes the following mental limitations: Archambault is unable to work in large crowds and can only work with groups of less than ten; she can adapt to routine work environments and make simple decisions; and she can understand, remember, and carry out moderately complex tasks. (AR 16.)

16

The ALJ did not consider Dr. Edelstein's opinions under the treating physician rule and applicable regulations. First, as discussed above, the ALJ did not clearly state what weight he afforded to each of Dr. Edelstein's opinions; and although the ALJ stated that he afforded "some weight" to portions of these opinions, the RFC determination indicates otherwise. Second, the ALJ did not consider that Dr. Edelstein is a specialist (a psychiatrist) who had a substantial treatment relationship with Archambault, meeting with her approximately ten times over an 18-month period. (*See, e.g.*, AR 600–02, 617–23, 678–79, 797.) *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (holding that, even when a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors—including the length of the treatment relationship, the frequency of examination, and whether the physician is a specialist in the area covering the particular medical issues—in determining how much weight it should receive); *see also* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion. When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than [the ALJ] would give it if it were from a nontreating source.") Third, although the ALJ correctly stated that Archambault's function reports "do not allege difficulty paying attention" (AR 23), they do generally indicate that Archambault's depression, anxiety, and panic attacks limit her ability to complete tasks, stating for example that she does not handle stress well (AR 270); she

17

gets very nervous driving (*id.*); she "stays away from folks" (AR 283); she forgets things (AR 287); she feels "loopy and out in left field" (*id.*); she does not handle changes in routine well (AR 288); and she has unusual behaviors or fears including a fear of driving and "be[ing] out at times" (*id.*).

Furthermore, while the ALJ correctly pointed out that Dr. Edelstein's treatment notes contain statements indicating that Archambault's mental status was "largely within normal limits" (AR 23), the ALJ should have noted that Dr. Edelstein's treatment notes also document Archambault's mental limitations. For example, a September 2011 note states that, although Archambault was "doing well," she had "severe panic attacks on [a] long drive." (AR 618.) And a December 2010 note states that, despite Archambault being "elated with [the] birth of [her] granddaughter" and although her mood was "generally better with [a] higher dose of Celexa," she was still reporting anxiety, "particularly [the] urge to scratch her arms and obsessive[ly] ruminat[e] about bad things happening." (AR 623.)

## Conclusion

The Court finds that the ALJ did not give "good reasons" for the weight afforded to Dr. Macy's and Dr. Edelstein's treating physician opinions. It cannot be said that the ALJ's analysis of these medical opinions was harmless error, because the VE essentially testified that if these opinions were adopted, Archambault would be unable to work. (*See* AR 71.) The Court therefore GRANTS Archambault's motion (Doc. 8), in part, DENIES the Commissioner's motion (Doc. 15), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Archambault requests that, instead of remanding for further proceedings, the Court should reverse and remand solely for payment of benefits.  But in cases where there are gaps in the administrative record or, as here, the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Thus, Archambault's request that the matter be reversed and remanded solely for payment of benefits is denied.

Dated at Burlington, in the District of Vermont, this 23rd day of September, 2014.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge